# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

MARLO D. THOMAS,

     Plaintiff

v.

TED HANF, et al.,

     Defendants

Case No.: 3:20-cv-00487-MMD-CSD

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF No. 31

     This Report and Recommendation is made to the Honorable Miranda M. Du, Chief United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

     Before the court is Defendants' motion for summary judgment. (ECF Nos. 31, 31-1 to 31-6, 33, 34-1 to 34-6.) Plaintiff filed a response. (ECF No. 37, 38.) Defendants did not file a reply.

     After a thorough review, it is recommended that Defendants' motion be denied.

## I. BACKGROUND

     Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (Compl., ECF No. 6.) The events giving rise to this action took place while Plaintiff was housed at Ely State Prison (ESP). (*Id.*)

     The court screened Plaintiff's complaint and allowed him to proceed with claims for deliberate indifference to his serious medical needs under the Eighth Amendment against Nurse Luchessi and Dr. Hanf. (ECF No. 5.)

Plaintiff alleges that he was involved in a fight with another inmate on March 11, 2019, and after the fight he noticed his fingers were crooked and bleeding. He was sent to the infirmary, and he informed defendant Nurse Luchessi that his fingers were broken and he was in pain. Luchessi responded that it was obvious, but there was nothing she could do that night as ESP did not have the equipment. Plaintiff told her that he needed to go to the hospital, and she responded that it would cost him a lot of money and they would put a freeze on his prison account. Instead, she said she spoke with the prison provider, and the best she could do was to wash the blood off and wrap his fingers, but he would not receive medication or an x-ray. Plaintiff told Luchessi he was in pain, at a level of ten out of ten, and he needed to go to the hospital to see a doctor; however, Luchessi did not respond, and Plaintiff was escorted out of the room.

Plaintiff avers that he was in the infirmary for two and a half days, but he was not seen by medical staff. When he returned to his unit on March 13, 2019, he sent a medical kite. On March 27, 2019, he sent another medical kite after he had learned to write with his left hand. On March 28, 2019, Plaintiff claims he was served with the notice of charges regarding the altercation, and the officer stopped the hearing and contacted medical when he saw Plaintiff was in pain and having difficulty signing the paperwork. He subsequently filed emergency and regular grievances about his finger.

Plaintiff alleges that through Luchessi, Dr. Hanf became aware of Plaintiff's injury on March 11, 2019; however, despite this (and despite Plaintiff's kites and grievances), Dr. Hanf did not see him until April 4, 2019. Dr. Hanf ordered x-rays and pain medication and confirmed that he had ordered the "soft splint" that Luchessi had given him (i.e., the wrapping of his fingers in a bandage).

1  Plaintiff saw an orthopedist, Dr. Walls, on May 6, 2019, who recommended trying a

2  splint for six weeks, and if that did not work, he would request that Plaintiff have surgery.

3  Plaintiff eventually saw another orthopedist, whom Plaintiff claims told him he had very limited

4  options due to the delay in treatment.

5  Defendants move for summary judgment, arguing: (1) they did not personally participate

6  in the alleged constitutional violation; (2) Plaintiff's Eighth Amendment rights were not violated;

7  and (3) they are entitled to qualified immunity.

8  ## II. LEGAL STANDARD

9  The legal standard governing this motion is well settled: a party is entitled to summary

10  judgment when "the movant shows that there is no genuine issue as to any material fact and the

11  movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp.*

12  *v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the

13  evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v.*

14  *Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome

15  of the case. *Id*. at 248 (disputes over facts that might affect the outcome will preclude summary

16  judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the

17  other hand, where reasonable minds could differ on the material facts at issue, summary

18  judgment is not appropriate. *Anderson*, 477 U.S. at 250.

19  "The purpose of summary judgment is to avoid unnecessary trials when there is no

20  dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18

21  F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose

22  of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477

23  U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that

one party must prevail as a matter of law"). In considering a motion for summary judgment, all

reasonable inferences are drawn in the light most favorable to the non-moving party. *In re*

*Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach*

*& Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the

nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,*

477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and

determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255;

*Anderson*, 477 U.S. at 249.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis.

"When the party moving for summary judgment would bear the burden of proof at trial, 'it must

come forward with evidence which would entitle it to a directed verdict if the evidence went

uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing

the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp.*

*Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations

omitted). In contrast, when the nonmoving party bears the burden of proving the claim or

defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate

an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving

party cannot establish an element essential to that party's case on which that party will have the

burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to

establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine

dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute

4

be shown to require a jury or judge to resolve the parties' differing versions of truth at trial."

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)

(quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment

by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475

U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the

pleadings and set forth specific facts by producing competent evidence that shows a genuine

dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

### III. DISCUSSION

**A. Eighth Amendment Standard**

"The government has an 'obligation to provide medical care for those whom it is

punishing by incarceration,' and failure to meet that obligation can constitute an Eighth

Amendment violation cognizable under § 1983." *Colwell v. Bannister,* 753 F.3d 1060, 1066 (9th

Cir. 2014) (citing *Estelle v. Gamble*, 429 U.S. 97, 103-05 (1976)).

A prisoner can establish an Eighth Amendment violation arising from deficient medical

care if he can prove that prison officials were deliberately indifferent to a serious medical need.

*Estelle*, 429 U.S. at 104. A claim for deliberate indifference involves the examination of two

elements: "the seriousness of the prisoner's medical need and the nature of the defendant's

response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *rev'd on other*

*grounds, WMX Tech, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997); *see also Akhtar v. Mesa*, 698

F.3d 1202, 1213 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)).

If the medical need is "serious," the plaintiff must show that the defendant acted with

deliberate indifference to that need. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213 (citation

omitted). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051,

1060 (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or even gross negligence. *Id*. Inadvertence, by itself, is insufficient to establish a cause of action under section 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (citation omitted).

Deliberate indifference exists when a prison official "den[ies], delay[s] or intentionally interfere[s] with medical treatment, or it may be shown by the way in which prison officials provide medical care." *Crowley v. Bannister*, 734 F.3d 967, 978 (9th Cir. 2013) (internal quotation marks and citation omitted).

Here, Defendants do not dispute Plaintiff suffered from a serious medical need; therefore, the court's analysis will focus on the subjective deliberate indifference prong of the Eighth Amendment.

**B. Facts**

Plaintiff was involved in a fight with another inmate on March 11, 2019. He was subsequently brought to the infirmary for an injury to two fingers on his right hand. The investigation detail report from the March 11, 2019 incident says that Plaintiff was assessed by medical and he complained of pain to the right middle finger, and had swelling and limited range of motion with flexion, and was escorted to the trauma room for further treatment. (ECF No. 37 at 29.)

According to the unusual occurrence report created by medical staff, Plaintiff said he was in no pain, but he thought his finger was broken. Plaintiff's wounds were cleaned and his middle and ring finger were "soft splinted" and Plaintiff was told to kite as needed. (ECF No. 34-1 at 2.)

Luchessi's discovery responses state that Plaintiff was asked if he wanted to go to the hospital, and he asked who was going to pay, and the officers explained to Plaintiff that whoever started the fight is usually responsible for the medical expenses. According to Luchessi, Plaintiff responded, "fuck that, I am not going to pay shit, I am not going," and Plaintiff refused to go to the hospital. Luchessi also states that she had no authority to provide Plaintiff with pain medications without a doctor or physician's assistant signing off. (ECF No. 31-4 at 5.)

Plaintiff, on the other hand, states in his declaration that he told Luchessi his fingers were broken and blood was coming through the skin and he was in extreme pain. Luchessi responded that his injury was obvious, but there was nothing she could do that night because ESP did not have the equipment. Plaintiff told her again that he had two broken fingers and needed to go to the hospital. Plaintiff claims Luchessi told him it would cost a lot of money and they would freeze his prison account, and the best she could do was wash the blood off and wrap his fingers up, but they would not do an x-ray or give him any medication. Plaintiff claims he told Luchessi again that he was in pain and needed to see a doctor at the hospital, and his pain was at a level ten out of ten, to no avail. (ECF No. 6 at 33-34; ECF No. 37 at 33.) Plaintiff's first level grievance similarly asserts that he was told that they were not equipped to treat his finger. (ECF No. 31-3 at 6, 8-9.)

Plaintiff maintains he did not refuse to be transported to the emergency room, and he did not tell Luchessi that he was not going to pay for anything and would not go. (ECF No. 37 at 33.)

Plaintiff provides the declaration of Norman Belcher, the inmate with whom he was fighting, who corroborates Plaintiff's version of events. (ECF No. 37 at 36.)

Defendants assert that Plaintiff did not file a medical kite after this until March 27, 2019; however, Plaintiff presents evidence that he sent a medical kite on March 13, 2019, stating that he needed help and medical attention for his broken fingers. (ECF No. 6 at 20, 34-35.)

Plaintiff filed another kite on March 27, 2019, which said he had learned to write with his left hand, and requested medical treatment "asap" for his broken fingers. He stated that he was not given an x-ray or medication. In response, Plaintiff was told that x-rays were ordered, and Plaintiff was placed on the provider's list, and Ibuprofen was ordered. (ECF No. 6 at 41.)

Plaintiff asserts that on March 28, 2018, he was served with the notice of charges (for the fight) and the officer stopped the hearing and requested medical care when he saw Plaintiff was in pain and was having difficulty with the paperwork. (ECF No. 6 at 35.)

Plaintiff was seen on nursing sick call on March 29, 2019, for his broken fingers which he claimed were painful. His right middle finger appeared swollen and rigid, and he was unable to bend it. The provider was informed. (ECF No. 34-2 at 8.)

There is a notation on March 31, 2019, that Plaintiff refused to go get his hand x-ray until he saw the provider. (ECF No. 34-2 at 7; ECF No. 34-3 at 5.)

On March 31, 2019, Plaintiff filed an emergency grievance explaining that an officer called him to ask if he wanted to go for x-rays, and he responded that he was scheduled to see the doctor the following day, so he did not want to go. The officer called back and told Plaintiff medical said that if he did not go they would not allow him to see the doctor. Plaintiff told the officer to tell medical that if the doctor says he needs it, he will do it. The response states: the

provider requested x-rays be done before he sees you, and instructed Plaintiff to kite to reschedule the x-ray. (ECF No. 6 at 49-50.)

On April 1, 2019, Plaintiff filed another emergency grievance, stating that he was in pain and could not bend his fingers, and no one was doing anything to help him. In response, Plaintiff was told that he was scheduled to be seen the following day. (ECF No. 6 at 51.)

Plaintiff saw Dr. Hanf on April 4, 2019, for the pain in his right hand. Dr. Hanf noted Plaintiff had swelling and limited range of motion. An x-ray was ordered to rule out a fracture, and Plaintiff was referred to an orthopedist. The orthopedist referral notes that Plaintiff was unable to flex or extend his finger. (ECF Nos. 34-2 at 7, 34-4 at 10-11.)

Plaintiff claims that he asked Dr. Hanf why it took so long for him to see Plaintiff when he was aware of Plaintiff's condition, and Dr. Hanf responded, "you received a soft splint didn't you?" and confirmed he was the one who ordered the soft splint. Plaintiff told Dr. Hanf that wrapping his fingers in a bandage is not a splint, and Dr. Hanf replied that he was the doctor. (ECF No. 6 at 36.)

The x-ray was completed on April 6, 2019, which showed a prominent chip fracture from the dorsal aspect of the base of the distal phalanx of the third finger which resulted in anterior subluxation of the distal phalanx. (ECF No. 34-5 at 3.) Plaintiff sent a kite that same day, stating that two nurses at the hospital said he should have been brought into the hospital the night of the incident, and that he needed to see a specialist to have his fingers fixed. The response states that medical was working on the orthopedic consultation and appointment "asap." (ECF No. 31-2 at 44.)

On April 8, 2019, a new request was made for an orthopedic consultation. The referral form appears to state: "Delay in Tx-functional deficit-static deformity." (ECF No. 34-4 at 9.)

Plaintiff sent a kite on April 9, 2019, stating that his right hand was scabbing, and that Nurse Luchessi did nothing on March 11, 2019, for his pain. He asked when he would see the specialist. In response, he was told that the orthopedic consultation was pending approval by the Utilization Review Committee. (ECF No. 31-2 at 43.)

Plaintiff sent a kite on April 15, 2019, asking to see Dr. Hanf regarding his x-ray results from April 6, 2019. He was advised that he was scheduled to see the provider to go over his x-ray results. (ECF No. 31-2 at 41.)

On April 20, 2019, Plaintiff sent another kite asking when he would see the provider to go over his x-rays. He also asked to see his medical records. He was told that he could request a chart review. (ECF No. 31-2 at 40.) He did so on April 22, 2022, and was placed on the list for chart review. (*Id*. at 39.)

Plaintiff sent his next kite on April 26, 2019, stating that he was still in pain and his finger had not been fixed. He was advised that the orthopedic referral had been made. (ECF No. 31-2 at 38.)

On April 28, 2019, he asked again to see Dr. Hanf to go over his x-ray results. (ECF No. 31-2 at 37.) He sent a kite the next day stating that he was still in pain, and it had been almost two months since his injury. (*Id*. at 36.)

Plaintiff saw orthopedist Dr. Walls on May 6, 2019, for pain in his right third distal finger, which he rated at a six or seven out of ten. Dr. Walls stated that the ideal treatment is "ORIF[1] within 2 weeks of injury." Dr. Walls indicated that the surgery could be attempted at that time, but it would be more difficult, and if it was attempted he would recommend a fellowship-

---

[1] ORIF refers to open reduction internal fixation surgery used to fix severely broken bones. *See* ORIF Surgery: When It's Needed and How It's Done (webmd.com), last visited October 26, 2022.

trained hand surgeon. The second option was to splint the fingers for six weeks (until roughly June 17, 2019) to try and obtain bone union; however, the prominence and subluxation of the distal phalanx would persist. The third option was to fuse the right middle finger DIP joint surgically, which could be done in the future if splinting did not work. Dr. Walls noted that pain may persist with each of these options. They opted to proceed with the splinting trial, and Plaintiff was instructed to return for continued symptoms. (ECF No. 34-4 at 7-8.)

Plaintiff filed an emergency grievance the following day, stating that his finger was hurting and the splint was not going to fix it, and said Dr. Walls said he would see if the prison would approve surgery. The response states that the doctor ordered a splint to be worn for six weeks, and Plaintiff would be re-evaluated at that time. (ECF No. 6 at 46.)

Plaintiff sent a kite on May 11, 2019, stating he was still in pain and needed surgery to fix his finger. He was told in response that the orthopedist recommended splinting for six weeks, and he should keep the splint in place and would be re-evaluated after the six weeks. (ECF No. 31-2 at 35.)

Plaintiff sent a kite on July 14, 2019, asking why he had been returned to ESP when he was to see the orthopedist after six weeks. He said that his finger was not responding to the splint, and he thought it would require surgery. (ECF No. 31-2 at 32.)

He sent another kite on July 30, 2019, stating that his finger was deformed because he was not referred to an orthopedist who could set and cast his finger. He was advised he was scheduled to see the provider. (ECF No. 31-2 at 30.) He sent a second kite that day stating that his finger still hurt, and the splint was not working, and his pain level was at an eight. (ECF No. 31-2 at 31.)

Plaintiff sent a kite on August 15, 2019, asking why he was not taken to the hospital on March 11, 2019. The response recounted the treatment he had been given. (ECF No. 31-2 at 20.)

On August 20, 2019, Plaintiff sent a kite that requested new tape and a new splint for his finger. (ECF No. 31-2 at 19.) Plaintiff sent another kite that his finger did not align because of the delay in sending him to the hospital and referring him to an orthopedist. He indicated he was still in pain, and he had requested a new splint, but there had been no response from Dr. Hanf. He was advised he was scheduled to see the provider. The responder also said that Plaintiff was seen at nursing sick call on August 21, 2019, and at that time he said he did not need the splint anymore. (ECF No. 31-2 at 18.)

There is a notation on August 21, 2019, that the splint was ordered for six weeks on May 6, 2019, and on August 21, 2019, Plaintiff was not wearing the splint when he arrived for the visit. No gross deformity was noted, but Plaintiff had slight tenderness with range of motion. It was confirmed that Plaintiff was on the list for the provider for a follow up. The response also indicates that Plaintiff said he did not need the splint any longer and he returned it. (ECF No. 34-2 at 5.)

Plaintiff sent another kite the same day stating that the nurse came to his cell and took his splint, claiming that his six weeks was up. He complained that he no longer had anything to keep his finger straight, and certain movements caused him pain which the splint had helped. The response states that Plaintiff had the splint longer than suggested by the orthopedic specialist. Plaintiff was advised to start gently moving his finger to stretch it, and he was scheduled to see Dr. Hanf. (ECF No. 31-2 at 15.)

Plaintiff sent another kite that day reiterating that the nurse took his splint, claiming it was overdue. Plaintiff said he needed the splint to keep his finger extended and it helped him

12

with his pain. The response states that wearing the splint for as long as he did gave the finger more than enough time to heal. He was advised to do gentle stretching. (ECF No. 31-2 at 25.)

Plaintiff sent a kite to Dr. Hanf on August 22, 2019, stating that he needed surgery to fix his finger that was causing him pain. The response states: "what is your medical question?" (ECF No. 31-2 at 17.) Plaintiff also filed an emergency grievance that day about the nurse taking his splint, and complained that he was still in pain. (ECF No. 6 at 48.)

Plaintiff sent a kite on August 23, 2019, stating that the specialist told him he did not think the splint would be effective, and if it was not after six weeks, he would re-evaluate and request surgery, which the specialist did not think would be approved. Plaintiff was told that he was already on the list to see the provider. (ECF No. 31-2 at 16.)

Plaintiff sent another kite on August 25, 2019, about splints at ESP, and he was advised that he had his splint longer than directed and it had hard plastic or metal in it so it was confiscated. He was told that wearing the splint too long can weaken the finger. He was instructed to do mild stretching. (ECF No. 31-2 at 24.)

There is a notation on August 29, 2019, that Plaintiff desired surgical resolution because he had minimal improvement and pain (after wearing the splint), and he should see an orthopedist. (ECF No. 34-4 at 5.)

On September 17, 2019, Plaintiff sent a kite asking if he could see a new orthopedic provider other than Dr. Walls, who told him the splint would not work and that surgery would not likely be approved. Plaintiff was told in response that he did not have a choice in which doctor he sees. (ECF No. 31-2 at 29.) Plaintiff sent another kite on September 25, 2019, stating that he requested a second opinion, and Administrative Regulation 613 says as second opinion will be used as necessary to resolve borderline cases. He again requested a second opinion. He

was told that he did not have a choice in which provider he sees, and he was on the schedule to see the provider. (ECF No. 31-2 at 28.)

On September 30, 20019, he sent another kite asking when he would see the orthopedist. He was told that they had to get approval and then the appointment had to be set. (ECF No. 31-2 at 27.)

There is a notation on October 23, 2019, that Plaintiff refused transport for his orthopedic appointment. Plaintiff wrote on the form: "I am not refusing, am asking to see a different orthopedic due to his claim that there is nothing we can do. Came to him late. That they won't approve surgery and need surgery." (ECF No. 34-3 at 4.)

That day, he sent another kite stating that he would pay for a second opinion, and that he needed surgery as he was still in pain. He was told again that he did not have a choice regarding which doctor he sees. (ECF No. 31-2 at 26.)

On November 21, 2019, another referral was made to an orthopedic specialist, noting that there was delayed treatment, and splinting had been attempted as conservative management, but Plaintiff desired surgery as he had minimal improvement in his pain, healing and dysfunction. (ECF No. 34-2 at 3; ECF No. 34-4 at 4.)

There are notations on December 10 and 11, 2019, that Plaintiff refused transport to see the hand specialist, stating that his grandmother from New York was coming for a visit. (ECF No. 34-3 at 3-4.)

On December 11, 2019, Plaintiff sent a kite stating that he did not refuse to see the orthopedist, but he was scheduled for a chronic care appointment with G. Martin, APRN on December 10th, and he could not be in two places at once. The response states that the chronic

care appointment was at ESP, and Plaintiff refused to go to the specialist appointment. (ECF No. 31-2 at 14.)

On December 13, 2019, Plaintiff sent a kite that his finger was hurting and was deformed, and asked to see the doctor. He was advised to kite appropriately. (ECF No. 31-2 at 13.)

He sent another kite on January 20, 2020, asking when he would be resubmitted for a referral as his finger was still hurting. He was told that it was pending. (ECF No. 31-2 at 12.) He sent kites on January 23, March 2, March 23, and April 12, asking about the referral, and was told that he had refused his last transfer and that he was scheduled to see the doctor. (ECF No. 31-2 at 7-12.)

Dr. Hanf ordered another orthopedic consultation on April 21, 2019.

Plaintiff saw another orthopedist, Dr. Allred, on May 6, 2020. Dr. Allred examined Plaintiff and determined he had a chronic bony mallet of the right long finger, and said there were three options: (1) live with it in its current state, but he will continue to have pain in his joint; (2) joint open reduction internal fixation; however, Dr. Allred later concluded this was not a viable option; or (3) fusion. Regarding fusion, Dr. Allred stated that there would be little or no motion of the PIP joint, but most patients find this tolerable and very functional. At the time of the appointment, Plaintiff refused the fusion option because he said he needed to be able to make a fist to protect himself. Dr. Allred stated that most people could make a fist with therapy, and the fusion option was his recommendation, but only if Plaintiff's pain was severe enough to merit surgery. (ECF No. 34-6 at 2.) Dr. Allred noted regarding the delay in diagnosis that patients with a bony mallet fracture such as this often end up with a stiff PIP joint even in the best-case scenario with immediate treatment and early surgery. (*Id*. at 3.)

1    Plaintiff sent a kite on May 24, 202, asking when he would have surgery to fix his finger.

2  The response states that Dr. Allred was no longer considering surgery as an option. (ECF No. 31-

3  2 at 6.)

4    Plaintiff sent another kite on June 2, 2020, asking about surgery, and the response states it

5  is up to the surgeon whether to do surgery or not. (ECF No. 31-2 at 4.)

6    Plaintiff sent a kite to Dr. Hanf on July 19, 202, stating he was still in excruciating pain,

7  and it was affecting his life, and he needed his finger fixed. The response states that there is not

8  much that can be done if the surgeon does not want to operate other than taking anti-

9  inflammatory medications. (ECF No. 31-2 at 3.)

10    Plaintiff sent another kite to Dr. Hanf on August 11, 2020, asking for care for his painful

11  finger. The response states that Plaintiff refused to see nursing sick call on August 16, 2020.

12  (ECF No. 31-2 at 2.)

13  **C. Analysis**

14    **1. Luchessi**

15    There is a dispute of fact as to whether Luchessi was deliberately indifferent to Plaintiff's

16  serious medical need. While Luchessi claims Plaintiff said he was in no pain and refused to go to

17  the hospital, and he was given a soft splint and told to kite if he had any other issues, Plaintiff

18  provides evidence that directly contradicts her position. Plaintiff maintains he told Luchessi

19  multiple times that he was in significant pain and he wanted to go to the hospital for treatment,

20  but she disregarded his statements, and she failed to provide him with any pain medication.

21  Luchessi contends she was not authorized to prescribe pain medication, but according to

22  Plaintiff, she told him she spoke to the provider about giving him the soft splint, and therefore, it

23  is plausible she could have asked the provider about pain medication.

16

1    Therefore, Luchessi is not entitled to summary judgment.

2    **2. Dr. Hanf**

3    There is also a dispute of fact as to whether Dr. Hanf was deliberately indifferent to

4    Plaintiff's serious medical needs.

5    First, Plaintiff presents evidence that Dr. Hanf was aware of Plaintiff's condition on

6    March 11, 2019, and Plaintiff sent kites that he was still in pain on March 13 and 27, 2019, but

7    Plaintiff did not see Dr. Hanf until April 4, 2019. Dr. Hanf's own referral to an orthopedist on

8    April 8, 2019 as well as a notation on November 21, 2019, appear to acknowledge that there had

9    been a delay in treatment and Plaintiff had a functional deficit and static deformity. Coupled with

10    the fact that Dr. Walls stated that the ideal treatment was an ORIF surgery within two weeks of

11    the injury, Plaintiff has presented evidence to create a genuine dispute regarding whether Dr.

12    Hanf denied or delayed appropriate treatment.[2]

13    Plaintiff has also raised a dispute concerning whether Dr. Hanf was deliberately

14    indifferent with respect to the delay in treatment after that point. Plaintiff saw Dr. Walls on May

15    6, 2019, who recommended Plaintiff try a splint for six weeks, until around June 17, 2019, and if

16    that did not work, Plaintiff would be re-evaluated for a surgical option. After the six weeks

17    passed, Plaintiff sent kites in July and August of 2019 stating that his finger did not respond to

18    the splint and he was still in pain. There is a notation on August 29, 2019, several months after

19    the splint trial expired, that Plaintiff should see an orthopedist. Plaintiff sent a kite on September

20    30, 2019, asking when he would see an orthopedist and he was told that it had to be approved.

21    Plaintiff does not specifically dispute that he refused transport on October 23, 2019, because he

22

23    _____

[2] On the other hand, Dr. Allred said that patients with a bony mallet fracture usually end up with a stiff joint, even if they receive immediate treatment and early surgery. (ECF No. 34-6 at 3.)

1 wanted to see a different orthopedist, but the fact remains that it had been over four months since
2 Plaintiff was to be re-evaluated for a surgical option.

3        Dr. Hanf made another referral to an orthopedist on November 21, 2019; however, there
4 is a factual dispute regarding whether Plaintiff refused transport to see the orthopedic surgeon on
5 December 10 and 11, 2019. Plaintiff claims that he was scheduled for another chronic care
6 medical appointment at the same time. Plaintiff continued to send kites in January, March, and
7 April of 2020, asking about a referral to the orthopedist, and he was told both that the referral
8 was pending and that he had refused the last time and he would see the doctor. Dr. Hanf ordered
9 another orthopedic consultation on April 21, 2020, and Plaintiff saw Dr. Allred on May 6, 2020.

10        When Plaintiff sent kites in May, June, July and August of 2020, stating he was still in
11 pain and asking about surgery, he was told the surgeon was no longer considering surgery;
12 however, Dr. Allred's report says that he no longer thought the joint open reduction internal
13 fixation was a viable option, but surgical fusion was an option as long as it was warranted by his
14 pain level. This is consistent with Dr. Walls' statement that surgical fusion could be done in the
15 future if splinting did not work. In short, there are two doctors recommending surgical fusion as
16 an option, and it does not appear, at least as of the filing of Plaintiff's response, that Plaintiff
17 received any further treatment for his finger after more than three years have passed since the
18 injury.

19        Plaintiff has raised a genuine dispute of material fact regarding whether Dr. Hanf was
20 deliberately indifferent to his serious medical need; therefore, Dr. Hanf is not entitled to
21 summary judgment.

22 ///

23 ///

**D. Qualified Immunity**

Defendants argue they are entitled to qualified immunity because: they did not personally participate in any alleged constitutional violation; they were not deliberately indifferent to a serious medical need; they cannot force Plaintiff to seek medical treatment; and they provided Plaintiff with appropriate care.

"In evaluating a grant of qualified immunity, a court considers whether (1) the state actor's conduct violated a constitutional right and (2) the right was clearly established at the time of the alleged misconduct." *Gordon v. County of Orange*, 6 F.4th 961, 967-68 (9th Cir. 2021) (citation omitted).

First, if the jury believes Plaintiff's version of events, it could conclude that Defendants' violated Plaintiff's Eighth Amendment Rights.

Second, it was clearly established that "'deny[ing], delay[ing], or intentionally interfere[ing] with medical treatment' can violate the constitution." *Stewart v. Aranas,* 32 F.4th 1192, 1195 (9th Cir. 2022) (quoting *Colwell v. Bannister,* 763 F.3d 1060, 1066 (9th Cir. 2014)). "A delay in treatment can violate the constitution if it results in injury." *Id*. (citation omitted). Here, Plaintiff has presented evidence that he has continued to suffer in pain as a result of the delay in providing him treatment for his finger.

Therefore, Defendants are not entitled to qualified immunity.

### IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order **DENYING** Defendants' motion for summary judgment (ECF No. 31).

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: October 28, 2022

Craig S. Denney
United States Magistrate Judge